IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In the matter of ) | |
| ) | |
| SUNNYSLOPE HOUSING LIMITED ) | |
| PARTNERSHIP, ) | |
| ) | |
| Debtor, ) | |
| _____) | |
| ) | |
| FIRST SOUTHERN NATIONAL BANK, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| vs. ) | No. 2:11-cv-2579-HRH |
| ) | [Consolidated with |
| SUNNYSLOPE HOUSING LIMITED ) | 2:12-cv-00597-HRH] |
| PARTNERSHIP, ) | |
| ) | Bk. No. 2:11-BK-2441-RJH |
| Appellee. ) | |
| _____) | |

<u>O R D E R</u>

In this consolidated appeal, appellant First Southern National Bank appeals the bankruptcy court's valuation order, the bankruptcy court's order confirming the debtor's plan of reorganization, and the bankruptcy court's order denying appellant's second stay relief motion. Oral argument was not requested and is not deemed necessary.[1]

---

[1]<u>See</u> Order from Chambers, Docket No. 91.

-1-

<u>Background</u>

Appellant is First Southern National Bank.  Appellee is the debtor, Sunnyslope Housing Limited Partnership.

Debtor is an Arizona limited partnership.[2]  Between 2005 and 2007, debtor began developing an apartment project in Phoenix, Arizona, which it intended to operate as an affordable housing community.[3]  Debtor obtained financing for the project from several sources.[4]

Debtor obtained private funding through a $8.5 million secured loan from Capstone Advisors, LLC.[5]  The Capstone Loan was guaranteed by HUD and secured by a Deed of Trust on the apartment project.[6]  The terms of the Capstone Loan provided for repayment over 40 years and interest calculated at 5.35% per annum.[7]  HUD required that a Regulatory Agreement for Multifamily Housing Projects be recorded.[8]

---

[2]Appellant's (Second) Appendix of Record at 168, ¶ 1, Docket No. 75-9.

[3]Appellant's (Second) Appendix of Record at 168, ¶¶ 2-3, Docket No. 75-9.

[4]Appellant's (Second) Appendix of Record at 168-69, ¶ 3, Docket No. 75-9.

[5]Appellant's (Second) Appendix of Record at 169, ¶ 7, Docket No. 75-9.

[6]Appellant's (Second) Appendix of Record at 169, ¶¶ 7-8, Docket No. 75-9.

[7]Appellant's (Second) Appendix of Record at 169, ¶ 9, Docket No. 75-9.

[8]Appellee's Supplemental Appendix of Record at 53-58, Docket
(continued...)

-2-

The HUD Regulatory Agreement provides that the "[o]wners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary."[9]

The financing for the Capstone Loan was funded by the sale of municipal bonds issued by the Phoenix Industrial Development Authority (IDA).[10]   The Phoenix IDA required the recording of a Regulatory Agreement and Declaration of Restrictive Covenants. Pursuant to this agreement, the debtor agreed to operate the apartment project in accordance with the affordable housing requirements of Internal Revenue Code § 142(d).[11] The IDA Regulatory Agreement provides that the covenants "shall run with the land and shall bind the Owner, and its successors and assigns and all subsequent owners or operators of the Project...."[12]   The IDA Regulatory Agreement further provides that "[t]his Agreement, and

---

[8](...continued)
No. 83-2.

[9]Appellee's Supplemental Appendix of Record at 54, Docket No. 83-2.

[10]Appellee's Supplemental Appendix of Record at 1, Docket No. 83-1.

[11]Appellant's (Second) Appendix of Record at 83, Docket No. 75-2.

[12]Appellant's (Second) Appendix of Record at 86, ¶ 5(a), Docket No. 75-2.

each and all of the terms hereof, shall terminate and be of no
further force and effect in the event of a foreclosure of the lien
of the Mortgage or delivery of a deed in lieu of foreclosure[.]"[13]

Debtor obtained $3 million in public funding from the City of
Phoenix Housing Department under an Affordable Housing Loan
Agreement (the "Phoenix Loan").[14]  The Phoenix Loan is secured by
a second-position Deed of Trust.[15]  The City required debtor to enter
into a Declaration of Affirmative Land Use Restrictive Covenants.
The City CCRs require the debtor to set aside twenty-three units of
the project as affordable housing.[16]  The City CCRs "are covenants
running with the Property, encumbering the Property, and are binding
upon the Owner's successors in title and all subsequent owners and
operators of the Property[.]"[17]  The City CCRs provide that "the
provisions hereof are expressly subordinate to the HUD insured
mortgage or Deed of Trust, to the HUD Regulatory Agreement, and
subordinate to all applicable HUD mortgage insurance ... regulations

---

[13]Appellant's (Second) Appendix of Record at 86, ¶ 5(e), Docket
No. 75-2.

[14]Appellant's (Second) Appendix of Record at 173, ¶ 43, Docket
No. 75-9.

[15]Appellant's (Second) Appendix of Record at 173, ¶ 44, Docket
No. 75-9.

[16]Appellant's (First) Appendix of Record at 579, ¶ 2, Docket
No. 38-7.

[17]Appellant's (First) Appendix of Record at 581, ¶ 4, Docket
No. 38-7.

and related administrative requirements."[18]  The City CCRs further provide that "[i]n the event of foreclosure or transfer of title by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate."[19]

Debtor also obtained $500,000 in public funding from the Arizona Department of Housing (the "Arizona Loan").[20]  The Arizona Loan is secured by a third-position Deed of Trust.[21]  The State required that debtor enter into a Declaration of Covenants, Conditions, and Restrictions.  The State CCRs require that debtor rent five units to low-income renters.[22]  The State CCRs are "covenants running with the land ... and shall pass to and be binding upon Owner's heirs, assigns and successors in title to the property[.]"[23]  The State CCRs further provide that "[t]he provisions of this Agreement are expressly subordinate to the Senior Loan, to the HUD Regulatory Agreement, and subordinate to all applicable HUD

---

[18]Appellant's (First) Appendix of Record at 580, ¶ 2(g), Docket No. 38-7.

[19]Appellant's (First) Appendix of Record at 580, ¶ 2(g), Docket No. 38-7.

[20]Appellant's (Second) Appendix of Record at 174, ¶ 48, Docket No. 75-9.

[21]Appellant's (Second) Appendix of Record at 174, ¶ 48, Docket No. 75-9.

[22]Appellant's (Second) Appendix of Record at 65, Docket No. 75-2.

[23]Appellant's (Second) Appendix of Record at 69, Part VI, ¶ 1, Docket No. 75-2.

-5-

mortgage insurance ... regulations and related administrative requirements."[24]   The State CCRs also provide that "[i]n the event of foreclosure or transfer by title of deed in lieu of foreclosure, any and all land use covenants contained in this agreement shall automatically terminate."[25]

Once the apartment project was completed,[26] debtor qualified for federal tax credits under the Low Income Housing Tax Credit (LIHTC) program.  "The LIHTC program provides a monetary incentive for investors to invest in low income housing by providing a return on their equity investments through tax credits as opposed to traditional cash returns."[27]  The tax credits are available for the first ten years a project operates as affordable housing.  The apartment project was first "placed in service" in 2008.[28] At the time of the bankruptcy proceedings, there were seven years of tax

---

[24]Appellant's (Second) Appendix of Record at 69, Part V, ¶ 1, Docket No. 75-2.

[25]Appellant's (Second) Appendix of Record at 69, Part V, ¶ 2, Docket No. 75-2.

[26]The completed project is known as The Hacienda at Sunnyslope d/b/a Pointe Del Sol Apartments.  Appellant's (Second) Appendix of Record at 168, ¶ 2, Docket No. 75-9.

[27]Appellant's (Second) Appendix of Record at 347, ¶ 20, Docket No. 76-4.

[28]Appellant's (Second) Appendix of Record at 156, ¶ 2, Docket No. 75-7.

-6-

credits remaining.[29]  The tax credits are estimated at $539,973.00 per year.[30]

    As a condition of receiving the tax credits, debtor had to enter into a Declaration of Affirmative Land Use and Restrictive Covenants Agreement (the "LURA").  The LURA requires that all 150 units in the project meet the definition of "low income units" in Internal Revenue Code § 42(i)(3)(A).[31] The LURA provides that debtor may sell the project but requires that any buyer or successor be subject to the LURA requirements.[32]  The LURA covenants "are covenants running with the Project, encumbering the Project and land upon with the Project sits ... and are binding upon the Owner's successors in title and all subsequent owners and operators of the Project and the land upon with the Project sits[.]"[33]  The LURA also provides that "the provisions hereof are expressly subordinate to the HUD insured mortgage or Deed of Trust, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance

_____

    [29]Appellant's (Second) Appendix of Record at 156, ¶ 2, Docket No. 75-7.

    [30]Appellant's (Second) Appendix of Record at 156, ¶ 2, Docket No. 75-7.

    [31]Appellant's (Second) Appendix of Record at 385-386, Docket No. 76-13.

    [32]Appellant's (Second) Appendix of Record at 388, ¶ 2(H), Docket No. 76-13.

    [33]Appellant's (Second) Appendix of Record at 394, ¶ 10, Docket No. 76-13.

-7-

... regulations and related administrative requirements."[34]  The LURA further provides that "[i]n the event of foreclosure or transfer of title by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate."[35]

In the summer of 2009, debtor defaulted on the Capstone Loan.[36] In late 2009 or early 2010, HUD took over the loan from Capstone, and in September 2010, HUD sold the Capstone Loan to First Southern for $5,050,186.24.[37]  The Loan Sale Agreement provides that the Deed of Trust was a valid and enforceable lien on the property, subject to "any applicable bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally" and except for "covenants, conditions and restrictions, rights of way, easements and other matters of public record[.]"[38]  After the sale, HUD released the HUD Regulatory Agreement.[39]

---

[34]Appellant's (Second) Appendix of Record at 393, ¶ 9(H), Docket No. 76-13.

[35]Appellant's (Second) Appendix of Record at 393, ¶ 9(I), Docket No. 76-13.

[36]Appellant's (Second) Appendix of Record at 169, ¶ 11, Docket No. 75-9.

[37]Appellant's (Second) Appendix of Record at 169-170, ¶¶ 12-13, Docket No. 75-9.

[38]Appellant's (Second) Appendix of Record at 265, Section 7.02(C), Docket No. 76-1.

[39]Appellant's (First) Appendix of Record at 145-147, Docket No. 36-1.

-8-

In October 2010, First Southern filed a complaint against debtor in state court and moved for the appointment of a receiver.[40] A receiver was appointed for the project.[41]  There is evidence in the record that indicates that the receiver did not continue to operate the apartment complex as affordable housing.[42]  On November 1, 2010, First Southern noticed a trustee's sale of the project.[43] In December 2010, the receiver filed a claim with debtor's insurance company for damage from an October 2010 hailstorm.[44]  The claim was settled for $741,896.30, with the funds being deposited in debtor's operating account.[45]  In December 2010, the receiver agreed to a post-foreclosure sale of the property for $7,650,000.  The sale was not completed because of the filing of the instant bankruptcy action in January 2011.  The property was turned back over to the debtor on June 29, 2011.[46]

---

[40]Appellant's (Second) Appendix of Record at 170, ¶ 15, Docket No. 75-9.

[41]Appellant's (Second) Appendix of Record at 170, ¶ 15, Docket No. 75-9.

[42]Appellant's (Second) Appendix of Record at 934, Docket No. 79-6.

[43]Appellant's (First) Appendix of Record at 187, Docket No. 36-1.

[44]Appellant's (Second) Appendix of Record at 170, ¶ 17, Docket No. 75-9.

[45]Appellant's (Second) Appendix of Record at 170, ¶ 18, Docket No. 75-9.

[46]Appellant's (Second) Appendix of Record at 171, ¶ 25, Docket
(continued...)

Debtor's general partner filed a petition for involuntary bankruptcy on January 31, 2011. In April 2011, the bankruptcy court entered an order converting the involuntary bankruptcy to a voluntary Chapter 11 bankruptcy.

First Southern filed a claim in the bankruptcy action in the amount of $8,989,331.31.[47] In its plan of reorganization, filed on July 22, 2011, debtor asserted that First Southern's secured claim was valued at $2.5 million. In October 2011, First Southern filed a motion under Bankruptcy Code § 506(a) to determine the amount of its secured claim. First Southern presented an expert report from William M. Dominick and David C. Gironda, in which they valued the property at $7,740,000.[48] Their report was based on the assumption that

> the property will no longer participate in the LIHTC program, but will transition to prevail- ing fair market rents for the entire project. We assume that upon transfer of title via foreclosure or deed-in-lieu of foreclosure, any restriction requiring that the property con- tinue to be utilized as affordable housing would be extinguished and have no further effect. Consequently, no benefits from the

---

[46](...continued)
No. 75-9.

[47]Appellant's (Second) Appendix of Record at 172, ¶ 35, Docket No. 75-9.

[48]Appellant's (First) Appendix of Record at 1377, Docket No. 46-1.

-10-

> LIHTC program in the form of tax credits will
> be included in this valuation[.[49]]

Debtor's expert, Walter Winius Jr. of Integra Winius Realty Analysis, opined in his report that the value of the property without rent restrictions was $7,000,000 and that the value of the property with rent restrictions was $2,600,000.[50] Mr. Winius did not include the "value of the federal and state tax credits" in his value analysis.[51] First Southern then submitted a rebuttal report from Mr. Dominick, in which he opined that the value of the "tangible" property with rent restrictions was $4,885,000,[52] and that "the value of the intangible property (LURA Credits) is estimated to be $2,910,000."[53] Thus, Mr. Dominick concluded that the value of the property "as an Affordable Housing project, in accordance with the LURA rent restrictions, was $7,795,000."[54]

---

[49]Appellant's (First) Appendix of Record at 1377, Docket No. 46-1.

[50]Appellant's (First) Appendix of Record at 1065, Docket No. 42-1.

[51]Appellant's (First) Appendix of Record at 1061, Docket No. 42-1.

[52]Appellant's (First) Appendix of Record at 1237, Docket No. 45-2.

[53]Appellant's (First) Appendix of Record at 1237, Docket No. 45-2. At the valuation hearing, the bankruptcy court excluded Mr. Dominick's opinion as to the value of the tax credits. <u>See</u> Appellant's (First) Appendix of Record at 1301, Docket No. 45-6.

[54]Appellant's (First) Appendix of Record at 1237, Docket No. 45-2.

-11-

A hearing on First Southern's valuation motion was held on December 6, 2011.  In its preliminary remarks, the bankruptcy court stated that it believed "that value would have to be based upon the value of the property as it is owned by the Debtor, which means as low-income property, and that you would not ascribe any value to the tax credits unless First Southern can show that it has a lien on the tax credits, and I don't think it has."[55]  During the hearing, the bankruptcy court also remarked that it did not think it could "value First Southern's interest in the property [by] ignoring the fact that it's owned by the Debtor and it's subject to restrictions on how it may be used by the Debtor."[56]  After hearing the evidence, the bankruptcy court orally ruled that "for purposes of § 506(a), the value of the real property, the tangible real property, is 2.6 million."[57]  The bankruptcy court explained that it was so ruling because "the only other value that was offered ... was Mr. Dominick's value of 4.5 million.  That came in supported solely by one paragraph of the rebuttal report [and] I don't see any support

---

[55]Appellant's (First) Appendix of Record at 1274, Docket No. 45-6.

[56]Appellant's (First) Appendix of Record at 1285, Docket No. 45-6.

[57]Appellant's (First) Appendix of Record at 1373, Docket No. 45-6.  The bankruptcy court memorialized its oral ruling in a written order, which provided that "Findings of Fact and Conclusions of Law were stated on the record.  The court finds the value of the property is 2.6 million."  Appellant's (First) Appendix of Record at 1260, Docket No. 45-3.

-12-

for Mr. Dominick's assumption as to what increase in the rent caps will be allowed by HUD."[58]

After the bankruptcy court issued the valuation order, First Southern elected to have its entire claim treated as fully secured pursuant to Bankruptcy Code § 1111(b)(2).[59]

On February 29 and March 1, 2012, the bankruptcy court held a hearing on the confirmation of debtor's plan of reorganization. The plan proposed to pay $2.6 million of First Southern's secured claim over 40 years with an interest rate to be determined.[60] The balance of First Southern's claim was to be paid as a balloon payment at the end of the 40-year term.[61] In addition, the plan provides that the receiver shall transfer to debtor the $713,094.29 in the hail damage insurance proceeds, which debtor will use to complete the repairs.[62] Any of the insurance proceeds not used for repairs are to be paid

---

[58]Appellant's (First) Appendix of Record at 1373, Docket No. 45-6.

[59]Appellant's (Second) Appendix of Record at 172, ¶37, Docket No. 75-9. "[T]he purpose of the § 1111(b) election is to allow the secured creditor to protect its interest in collateral that might appreciate in value or be worth more than the court determined when a debtor's plan permits a 'cash out' at a depressed value." In re Red Mountain Machinery Co., 451 B.R. 897, 903 (Bankr. D. Ariz. 2011).

[60]Appellant's (Second) Appendix of Record at 176, ¶ 55(a), Docket No. 75-9.

[61]Appellant's (Second) Appendix of Record at 176, § 55(a), Docket No. 75-9.

[62]Appellant's (Second) Appendix of Record at 990, Docket No. 80-1.

-13-

to First Southern.[63]   Funding for the plan was to be provided by debtor's new equity partners and from revenues generated by continued operation of the apartment complex as affordable housing.[64]

At the confirmation hearing, First Southern presented the expert testimony of Michael S. Linsk on the interest rate issue. Mr. Linsk opined in his expert report "that the appropriate risk-adjusted rate of interest ... is 8.0%."[65]  Mr. Linsk used the formula approach which starts with a base rate and adds additional adjustments for certain risks factors.[66]  Mr. Linsk "believe[d that] for a long term, fixed rate real estate loan ... the most appropri-ate" base rate "is comparable duration U.S. Treasuries", which then had an interest rate of 3.07%.[67]  Mr. Linsk factored in the following risk factors to arrive at a rate of 8.0%:  1) the property had a poor history of occupancy, 2) the improved occupancy rates were based on rental concessions and below-market rents, 3) 100% loan-to-value exposure, 4) the Phoenix market conditions, 5) debtors' new

---

[63]Appellant's (Second) Appendix of Record at 990, Docket No. 80-1.

[64]Appellant's (Second) Appendix of Record at 999, Docket No. 80-1.

[65]Appellant's (Second) Appendix of Record at 203, Docket No. 75-9.

[66]Appellant's (Second) Appendix of Record at 209, Docket No. 75-9.

[67]Appellant's (Second) Appendix of Record at 209, Docket No. 75-9.

-14-

equity partners lack of qualifications as affordable housing operators, and 6) the lack of evidence of any future source of capital should it be required.[68]

Debtor presented the expert testimony of Lynton Kotzin. Mr. Kotzin opined in his expert report that

> [u]nder the "prime-plus" formula approach discussed in the Supreme Court decision in the matter of <u>Lee M. Till v. SCS Credit Corporation</u>, with the current bank prime rate at 3.25 percent and an adjustment factor of between 100 basic points ("bps") and 150 bps to account for the risk of non-payment, the "prime-plus" approach indicates an appropriate interest rate in the range of 4.25 to 4.75 percent, with a midpoint of 4.50 percent. As a test for reasonableness of this range, we have also considered market rates for affordable multi-family housing projects, based on recent interest rate quotes and actual rates observed in recent transactions. Based on an analysis of market data, adding a spread of 220 bps to the current 10-year Treasury yield of 1.98 percent (for the month of December 2011) indicates a market rate of 4.18 percent. After consideration of each of these indications, we believe that an appropriate rate is 4.40....[[69]]

At the hearing, Mr. Kotzin discussed what debtor's counsel and the bankruptcy court referred to as the "springing value" of the property and how that value affected the interest rate. The bankruptcy court stated that

---

[68]Appellant's (Second) Appendix of Record at 203, Docket No. 75-9.

[69]Appellant's (Second) Appendix of Record at 926, Docket No. 79-6.

> [i]n this circumstance, there really are two
> very unusual kinds of springing value it seems
> to me.  Ordinarily when you have a loan that's
> secured by collateral or that is guaranteed[,]
> when the lender either goes to foreclose and
> sell the collateral or collect on the guaran-
> tee, all the lender is entitled to collect
> under either of those processes is the amount
> of the secured loan.  But in this case, because
> of the 1111(b) election[,] the amount the
> lender can collect is greater than the amount
> of the secured loan.[70]

Mr. Kotzin agreed with the bankruptcy court and stated that "I think that factors into the determination of the interest rate."[71]  Mr. Kotzin referred to this "springing value" as a credit enhancement.[72]

As for the feasibility of the plan, debtor offered evidence from Christine Shipley, the vice-president of the current property manager; Mr. Kotzin; Mr. Winius; and the new equity partners.  Ms. Shipley declared that occupancy had increased steadily over the last six months and that although conservative short-term income projections showed expenses increasing slightly faster than income, on average over time, rental increases would keep pace with operating expenses.[73]  Mr. Kotzin declared that

---

[70]Appellant's (Second) Appendix of Record at 1080, Docket No. 80-3.

[71]Appellant's (Second) Appendix of Record at 1080, Docket No. 80-3.

[72]Appellant's (Second) Appendix of Record at 1081, Docket No. 80-3.

[73]Appellant's (Second) Appendix of Record at 459-60, ¶¶ 77, 87, Docket No. 76-16.

-16-

> [t]he Debtor's Plan Projections ... project
> that the reorganized Debtor will be
> recapitalized with an approximately $434,000
> reserve that will more than adequately fund any
> operational shortfall at the Apartment Project
> during the early years of the Plan. The
> Debtor's projections contemplate that the
> Apartment Project will fully support its
> projected debt obligations within less than 2
> years after Plan confirmation and that the
> Debtor's operating reserves will have a net
> gain at the end of 2 years.[74]

Mr. Winius declared that "based on [his] analysis of historical trends in multi-family property values and the historical performance of large-multifamily communities like the Apartment Project, it is reasonable to expect that the Apartment Project will be economically viable at year 40 of the Plan and will have a value sufficient to satisfy all of the Debtor's projected year 40 obligations, including its balloon payments[.]"[75] Marty Aronson, one of the new equity investors, testified that he and Mr. Howard, the other new equity investor, were committed to funding the plan, including amounts exceeding their initial investment, if necessary.[76]

First Southern offered Mr. Linsk's opinion as to feasibility. He opined that the plan was not feasible, in part because debtor "is projected to generate negative operating cash flow after debt

---

[74]Appellant's (Second) Appendix of Record at 922, ¶ 13, Docket No. 79-5.

[75]Appellant's (Second) Appendix of Record at 494, ¶ 20, Docket No. 76-19.

[76]Appellant's (Second) Appendix of Record at 1288, Docket No. 81.

-17-

service on the Class 3 - First Southern Claim ... starting on the Effective date and thereafter" and "has failed to provide evidence to support the ability" to make the balloon payment.[77]

The bankruptcy court confirmed the plan in an oral ruling.[78] The bankruptcy court concluded that 4.4% was the appropriate interest rate.[79]   The bankruptcy court found the testimony of debtor's expert, Mr. Kotzin, more persuasive because he factored in "the springing value that arises from the combination of the termination of the LURA upon foreclosure by First Southern and the effect of the 1111(b) election[.]"[80]  The bankruptcy court explained that because First Southern could recover "somewhere in the range of seven to eight million dollars" following a foreclosure and the sale of the property, the "effective loan to value [ratio was] about 40 percent" and thus it was "appropriate to adopt an interest rate for this cram-down loan that is essentially the equivalent of current market rates for federally insured loans[.]"[81]

---

[77]Appellant's (Second) Appendix of Record at 204-205, Docket No. 75-9.

[78]A form written order was subsequently entered.  See Appellant's (Second) Appendix of Record at 1023-1027, Docket No. 80-2.

[79]Appellant's (Second) Appendix of Record at 1237, Docket No. 80-3.

[80]Appellant's (Second) Appendix of Record at 1233, Docket No. 80-3.

[81]Appellant's (Second) Appendix of Record at 1233-1234, Docket No. 80-3.

-18-

The bankruptcy court also concluded that the plan was feasible. The bankruptcy court found that debtor's evidence was weak, but that First Southern had offered no evidence of a lack of feasibility.[82] The bankruptcy court found that debtor would be able to "make the balloon payment in the year 40 because of, again, the springing value, which I do believe is real and exists, and must be taken into account."[83]  The bankruptcy court acknowledged the lack of 40-year budget projections, but found that this lack was not fatal because everyone seemed "to agree that 40 year projections would be virtually worthless anyway."[84]  The bankruptcy court found that "it is clear from the evidence that the market regards a 40-year plan for a LIHTC property as feasible ... [b]ecause otherwise we wouldn't have 40 year loans on LIHTC properties."[85]  The bankruptcy court also stated that the testimony convinced him that "it's more likely than not that this is the kind of a property that will be economically viable for 40 years...."[86]  The bankruptcy court also found that it

---

[82]Appellant's (Second) Appendix of Record at 1239-40, Docket No. 80-3.

[83]Appellant's (Second) Appendix of Record at 1244, Docket No. 80-3.

[84]Appellant's (Second) Appendix of Record at 1239, Docket No. 80-3.

[85]Appellant's (Second) Appendix of Record at 1240, Docket No. 80-3.

[86]Appellant's (Second) Appendix of Record at 1242-1243, Docket No. 80-3.

-19-

> was fair to take ... judicial notice if you
> will, that we are today probably at the bottom
> of the market, and if an apartment complex can
> cover its debt service for the next two or
> three years until the market recovers, it will
> probably survive for the long term and continue
> to cover the debt service for the long term.[87]

The bankruptcy court also found that "the testimony is really uncontradicted that this Debtor can feasibly, realistically cover the debt service, and not only for the next two or three years but at least as far out as six or seven years. And I think that goes a very long way to establishing feasibility even for 40 years[.]"[88]

On December 28, 2011, First Southern filed an appeal of the bankruptcy court's valuation order. On March 21, 2012, First Southern filed an appeal of the confirmation order and the order denying its second stay relief motion. This second appeal was consolidated with the first appeal on March 29, 2012.

## Standard of Review

"'The bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed de novo.'" In re JTS Corp., 617 F.3d 1102, 1109 (9th Cir. 2010) (quoting In re Strand, 375 F.3d 854, 857 (9th Cir. 2004)). The court "accept[s] the bankruptcy court's findings of fact, unless 'the court is left with the definite and firm conviction that a mistake has been

---

[87]Appellant's (Second) Appendix of Record at 1243-44, Docket No. 80-3.

[88]Appellant's (Second) Appendix of Record at 1244, Docket No. 80-3.

committed.'" Id. (quoting In re Greene, 583 F.3d 614, 618 (9th Cir. 2009)). "'Mixed questions of law and fact are reviewed de novo.'" Id. (quoting In re Chang, 163 F.3d 1138, 1140 (9th Cir. 1998)).

<u>Discussion</u>

First Southern first contends that the bankruptcy court erred in valuing its collateral as affordable housing. "'Valuation is a mixed question of law and fact[.]" In re Stembridge, 394 F.3d 383, 385 (5th Cir. 2004) (quoting In re T-H New Orleans Ltd. Partnership, 116 F.3d 790, 799 (5th Cir. 1997)).

The valuation of a secured claim is governed by § 506(a) of the Bankruptcy Code, which provides in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.  Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).  In Associates Commercial Corporation v. Rash, 520 U.S. 953 (1997), the Court considered "a dispute concerning the proper application of § 506(a) of the Bankruptcy Code when a bankrupt debtor has exercised the 'cram down' option...." Id. at 955. "Under the 'cram down' option, the debtor is permitted to keep the property over the objection of the creditor; the

-21-

creditor retains the lien securing the claim, and the debtor is required to provide the creditor with payments over the life of the plan, that will total the present value of the allowed secured claim[.]" Id. at 957 (citations omitted). The Fifth Circuit had valued the property in question (a tractor trailer) using a foreclosure-value standard. Id. at 958-59. The Court held that in a "cram down" case, "the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller." Id. at 960. The Court referred to this as a replacement-value standard. Id.

In reaching its holding, the Court explained that "[t]he first full sentence of § 506(a) ... tells a court what it must evaluate, but it does not say more; it is not enlightening on how to value collateral." Id. at 961 (emphasis added). Rather, the Court observed, the first full sentence of § 506(a) simply "tells us that a secured creditor's claim is to be divided into secured and unsecured portions with the secured portion of the claim limited to the value of the collateral." Id. "To separate the secured from the unsecured portion of a claim, a court must compare the creditor's claim to the value of 'such property,' i.e., the collateral." Id. The Court then explained that such a task can be complicated at times because a debtor may only own a partial

-22-

interest in the collateral or the creditor may hold a junior or subordinate lien.  Id.

The first sentence of § 506(a) has little, if any, application to the valuation issue here.  The first sentence of § 506(a) addresses what should be valued.  Here, there are no questions as to the what because this is not a case in which the debtor has only a partial interest in the property which is the collateral.  Here, debtor owns 100% of the collateral.  The issue in this case is how to value the collateral.

The answer to the how question is found in the second sentence of § 506(a), which provides that value "'shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.'"  Id. at 961 (quoting 11 U.S.C. § 506(a)).  In Rash, the Court found that the Fifth Circuit's foreclosure-value standard "rendered inconsequential the sentence that expressly addresses how 'value shall be determined.'"  Id. at 961-62.  The Court explained that

> [i]f a secured creditor does not accept a debtor's Chapter 13 plan,[89] the debtor has two options for handling allowed secured claims: surrender the collateral to the creditor, or, under the cram down option, keep the collateral over the creditor's objection and provide the creditor, over the life of the plan, with the equivalent of the present value of the collat-

---

[89]"Although Rash was decided in the context of Chapter 13, its holding applies equally to valuation of secured claims in Chapter 11."  In re Creekside Sr. Apartments, LP, --- B.R. ---, 2012 WL 2479549, at *11 (B.A.P 6th Cir. 2012).

-23-

> eral.  The "disposition or use" of the collat-
> eral thus turns on the alternative the debtor
> chooses-in one case the collateral will be
> surrendered to the creditor, and in the other,
> the collateral will be retained and used by the
> debtor.  Applying a foreclosure-value standard
> when the cram down option is invoked attributes
> no significance to the different consequences
> of the debtor's choice to surrender the prop-
> erty or retain it.  A replacement-value stan-
> dard, on the other hand, distinguishes reten-
> tion from surrender and renders meaningful the
> key words "disposition or use."

Id. at 962 (internal citations omitted).  The Court further explained that "[t]ying valuation to the actual 'disposition or use' of the property points away from a foreclosure-value standard when a Chapter 13 debtor, invoking cram down power, retains and uses the property.  Under that option, foreclosure is averted by the debtor's choice and over the creditor's objection."  Id.

First Southern reads Rash as requiring a determination of the replacement value in the context of the creditor's interest in the property when property is retained by a debtor.  First Southern then seems to suggest that this means that the court must value the property according to its highest and best use.  First Southern insists that a debtor cannot interfere with a creditor's right to recover on its secured claim by using the collateral for a less desirable economic purpose.  First Southern relies on In re Bell, 304 B.R. 878 (Bankr. N.D. Ind. 2003), to support its argument.  There, Sterling Bank had "a mortgage on the debtors' farm, which consists of approximately 40 acres divided between a homesite

-24-

containing debtors' residence and other improvements, 22 acres of tillable ground and 17 acres of marshland." Id. at 880. The debtors contended that the property should be valued at $154,000; the Bank contended that the property's value was $205,000. Id. The debtors valued the property as a "farm" and argued that under Rash this was the only use the court should consider since they wanted to keep farming the land. Id. The debtors also argued that the 17 acres of marshland had zero value because those acres were not tillable. Id. The court rejected the debtors' arguments. The court acknowledged that under Rash, "'"the proposed disposition or use" of the collateral is of paramount importance to the valuation question.'" Id. at 881 (quoting Rash, 520 U.S. at 962). But, the bankruptcy court explained that "in doing so the Court was referring to the debtor's 'two options' for dealing with secured claims—surrender the collateral to the creditor or retain it and pay the creditor the collateral's present value." Id. "Consequently, the Court's comments about the proposed disposition or use of property must be understood in light of these two alternatives—surrender or retain. Rash says nothing about setting a value that is based upon a use which might be unique to a particular debtor. Indeed, the Court specifically rejected what it called 'a ruleless approach' to value that would be 'based on the facts and circumstances of individual cases.'" Id. (quoting Rash, 520 U.S. at 965 n.5). "Debtor's argument would lead to just such

-25-

a case by case approach." Id.  The court further explained that "[d]ebtors' approach, which focuses only upon their own contemplated use for the property, overlooks the fact that when a farmer goes out into the market to acquire land, he competes with other buyers who are also interested in acquiring the property, potentially for a variety of different purposes." Id. "The purchase price ultimately paid by the successful buyer will be a product of this competition. Debtors' approach ... is unrealistic and fails to reflect the property's true replacement value—what it would cost them to acquire it." Id. at 882.

First Southern's argument fails for several reasons.  First, and most importantly, the standard established by the Court in Rash is that value is based on what a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller.  Debtor's "trade or business" is operating affordable housing.  The value of the apartment complex must therefore be based on what a willing buyer would pay for an apartment complex that will be operated as affordable housing.  The Court in Rash rejected a foreclosure value standard, which is, in essence, what First Southern argues should apply here.  Moreover, a foreclosure value would not be "relevant because no foreclosure is intended by the Plan" and "[v]aluation must be accomplished within the actual situation presented." In re Taffi, 96 F.3d 1190,

-26-

1192 (9th Cir. 1996).  The actual situation here is that the apartment complex will be operated as affordable housing.

Secondly, there is no requirement under § 506(a) that property be valued at its "highest and best" use.  See In re Donato, 253 B.R. 151, 155 (M.D. Pa. 2000)("In light of the Rash opinion, we find that to automatically apply the 'highest and best' use value to the real estate, without examining its proposed or intended use, is not proper"); In re Bishop, 339 B.R. 595, 600 (Bankr. D.S.C. 2005) (Rash requires court to consider the proposed use, not dispositions or uses that might have been proposed).  The proposed use of the apartment complex is as affordable housing.

Thirdly, the court is unpersuaded by the reasoning of Bell. As another court observed, "[t]he reasoning made by the court in Bell that consideration of a debtor's 'proposed disposition or use' is solely based upon whether the debtor intends to surrender or retain the collateral appears excessively restrictive."  In re Bishop, 339 B.R. at 600.  The Court in Rash stated that value under § 506(a) must be based on a consideration "of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed.'"  Id. (quoting Rash, 520 U.S. at 964)).  "This reference to 'various dispositions or uses' implies a broader range of options than that of either retention or surrender of the collateral, as contemplated by the court in Bell."  Id.

-27-

Under <u>Rash</u>, debtor's proposed use of the apartment complex had to be considered when valuing First Southern's collateral under § 506(a).  Debtor proposed using the apartment complex as affordable housing.  Thus, it was not error for the bankruptcy court to value First Southern's collateral as affordable housing.

The bankruptcy court did err, however, in failing to consider the value of the tax credits when determining the value of First Southern's collateral.  The court finds the reasoning of <u>In re Creekside Sr. Apartments, LP</u>, --- B.R. ---, 2012 WL 2479549 (B.A.P. 6th Cir. 2012), on this issue persuasive.  <u>Creekside</u> involved the valuation of various low-income housing complexes which were the collateral for secured claims held by the Bank of America.  <u>Id.</u> at *1.  The Bank argued that the fair market value of its collateral should include the remaining federal low-income housing tax credits.  <u>Id.</u> at *6.  The Bank did not claim that it had a secured interest in the tax credits, but rather that the tax credits could not be separated from the real property.  <u>Id.</u>  The debtors argued that the value of the tax credits was irrelevant to the value of the collateral.  <u>Id.</u>  The appellate court held that "the bankruptcy court did not err when it concluded, consistent with the Internal Revenue Code, relevant case law, and the record before it, that the value of the remaining tax credits is properly included in determining the amount of the Bank's secured claim."  <u>Id.</u> at *17.  The court explained that the value of the tax credits was properly

-28-

included because "'[a] willing buyer would most certainly consider the availability of section 42 tax credits when determining the fair cash value of the property[.]'"  Id. at *16 (quoting Rainbow Apartments v. Ill. Prop. Tax Appeal Bd., 762 N.E.2d 534, 537 (Ill. Ct. App. 2001)).  The appellate court observed that "[t]he question before the bankruptcy court was not whether the Bank has an independent security interest in the tax credits.  The issue was whether the fair market value of the various apartment complexes secured by the Bank's mortgages should reflect the value of the remaining tax credits."  Id.  Because the debtors still owned the tax credits, the court concluded that "determination of the Bank's interest in the Debtors' interest in the LIHTC properties must include consideration of the value of those credits."  Id.

Similarly here, the bankruptcy court's determination of the value of First Southern's collateral under § 506(a) should have included consideration of the value of the remaining tax credits. This court is aware that there may be some possibility that those tax credits are no longer available, but that is a determination for the bankruptcy court to make on remand.

In sum, as to the valuation issue, the bankruptcy court did not err in valuing First Southern's collateral as affordable housing. But, the bankruptcy court did err in failing to consider the value

-29-

of the remaining tax credits when determining the value of the apartment complex.[90]

First Southern next contends that the bankruptcy court erred in confirming the plan.  First Southern first argues that the bankruptcy court erred in finding the plan feasible.  "Section 1129(a)(11) of the United States Bankruptcy Code ... sets forth the feasibility requirement and provides that a plan may be confirmed only if confirmation 'is not likely to be followed by the liquida-tion, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.'"  In re Patrician St. Joseph Partners Ltd. Partnership, 169 B.R. 669, 674 (D. Ariz. 1994) (quoting 11 U.S.C. § 1129(a)(11)).  "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"  Matter of Pizza of Hawaii, Inc., 761 F.2d 1374,

---

[90]First Southern also raised an alternative argument that the bankruptcy court's valuation resulted in an unconstitutional judicial taking, but there has been no unconstitutional taking here.  See In re Thompson, 867 F.2d 416, 422 (7th Cir. 1989)("There is no taking when the creditor is simply told that if he extends security to a borrower who later goes bankrupt, he may not be able to enforce his security interest to the hilt."); Bank One, Chicago, NA v. Flowers, 183 B.R. 509, 519 (N.D. Ill. 1995) (citation omitted) ("the strip down that occurred in this case does not constitute a taking when it is authorized before the creditor makes the secured loan in question, which is the case here").

1382 (9th Cir. 1985) (quoting 5 <u>Collier on Bankruptcy</u> ¶ 1129.02[11] at 1129-34 (15th ed. 1984)).  "A plan meets th[e] feasibility standard if the plan offers a reasonable prospect of success and is workable."  <u>In re Partrician St. Joseph Partners</u>, 169 B.R. at 674.

First Southern argues that the bankruptcy court erred in finding the plan feasible because it was a 40-year plan and because there was no evidence that funds would be available at the end of the plan to make the balloon payment.  Neither of these arguments are well taken.  The fact that the plan was a 40-year plan does not necessarily mean the plan was not feasible.  <u>See</u> <u>In re Mallard Pond Ltd.</u>, 217 B.R. 782, 786 (Bankr. M.D. Tenn. 1997)("lengthy payout term is not a per se indication that a plan is not feasible").  And, debtor presented evidence that it would be able to make the balloon payment.[91]  However, the bankruptcy court's err as to the value of the First Southern's secured claim could impact the bankruptcy court's feasibility finding.  The bankruptcy court shall reconsider the feasibility of the plan on remand.

---

[91]This evidence included the testimony of Ms. Shipley, the vice-president of Dunlap and Magee Property Management, Inc., the company that is currently managing the apartment complex.  Shipley projected a positive cash flow and funding a cash reserve exceeding $500,000 within five years and increasing over the life of the plan.  Appellant's (Second) Appendix of Record at 459-62, Docket No. 76-16.  Other testimony came from Mr. Winius, whose economic study concluded that the value of the project at the end of 40 years would likely be sufficient to fund the payments then due either through refinancing or sale.  Appellant's (Second) Appendix of Record at 494, ¶ 20, Docket No. 76-16.

First Southern next argues that the bankruptcy court erred in confirming the plan with a 4.4% interest rate. The court "consider[s] the methodology used for determining interest de novo, but ... give[s] substantial deference to the factual calculation of the interest rate." In re Red Mountain Machinery Co., 471 B.R. at 250. When plans "provide for installment payments over a period of years[,] the amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim." Till v. SCS Credit Corp., 541 U.S. 465, 469 (2004). "The prime-plus or formula rate best comports with the purposes of the Bankruptcy Code." Id. at 479-80. This "approach begins by looking to the national prime rate[.]" Id. at 478-79. Then, "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach ... requires a bankruptcy court to adjust the prime rate accordingly." Id. at 479. "The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." Id.

The bankruptcy court used the proper methodology to determine the interest rate, and contrary to First Southern's contention, the bankruptcy court considered the Till factors. The 4.4% interest rate found by the bankruptcy court may be appropriate; however, the value of First Southern's collateral may impact this finding as

well.  The bankruptcy court shall reconsider its finding as to the interest rate on remand.

Next, First Southern contends that the bankruptcy court erred in confirming the plan because the plan did not satisfy the "best interest of creditors" test.  When, as here, there is a § 1111(b)(2) election, the creditor "will receive or retain under the plan ... property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.'"  In re Trenton Ridge Investors, LLC, 461 B.R. 440, 474-75 (Bankr. S.D. Ohio 2011) (quoting 11 U.S.C. § 1129(a)(7)(B)).  "Under this provision, 'the present value of such payments [to the § 1111(b)(2) elector] need only equal the value of the secured creditor's interest in its collateral.'"  Id. (quoting Dewsnup v. Timm, 502 U.S. 410, 430 n.3 (1992)).  Because the bankruptcy court erred in valuing First Southern's collateral, it necessarily follows that the best interest test will have to be reconsidered on remand.

First Southern next argues that the bankruptcy court failed to treat its claim fairly and equitably as required by 11 U.S.C. § 1129(b).  "The 11 U.S.C. § 1129(b)(2) cramdown provision specifies that a fair and equitable plan provide one of three alternatives for the holders of secured claims[,]" one of which is that the "'holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim,

-33-

of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]'" In re Ambanc La Mesa Ltd. Partnership, 115 F.3d 650, 653 (9th Cir. 1997)(quoting 11 U.S.C. § 1129(b)(2)(A)).

At the very least, First Southern argues that the bankruptcy court deprived it of receiving the present value of its secured claim by failing to include the value of insurance proceeds and excess rents for purposes of confirmation. This argument appears based on In re Ambanc La Mesa Ltd. Partnership, 115 F.3d 650. There, "Liberty National Enterprises, the only secured creditor in [a] single-asset bankruptcy of a 256-unit apartment project, appeal[ed] the confirmation of a Chapter 11 plan of reorganization which utilized the 'cramdown' provisions of 11 U.S.C. § 1129(b) of the Bankruptcy Code." Id. at 652. "The Plan purport[ed] to employ the first alternative means of fair and equitable treatment, 11 U.S.C. § 1129(b)(A)(i)-deferred cash payments equal to the present value at the effective date." Id. at 653-54. "The value of Liberty's secured claim for the purposes of confirmation is the market value of real property plus the net amount of the rents collected post-petition and pre-confirmation and subject to a deed of trust and assignment of rents." Id. at 654. "Thus, Liberty should have been paid on its secured claim of approximately $4.6 million-$4.3 million in the value of the real property and the estimated $300,000 accumulated cash collateral by the time of the

-34-

effective date" of the plan.  Id.  The Ninth Circuit held that the bankruptcy court had erred in confirming the plan because it did not include the accumulated cash collateral.  Id.

Similarly here, First Southern argues that the bankruptcy court erred in not including the cash collateral in the value of its secured claim.  First Southern argues that there can be no dispute that its lien covers the excess rents and insurance proceeds.  But, First Southern contends that under the plan that was confirmed debtor intends to use this cash and not remit it to First Southern.  In its briefing, First Southern contends that this constitutes approximately $663,000, but it is not clear how First Southern arrived at this amount.  In its objection to the plan, First Southern contended that there was $56,400 in excess rents and $745,000 in insurance proceeds.[92]

As for the insurance proceeds, the plan provides that the insurance proceeds are to be used to repair the roof, with any balance going to First Southern.  This is a proper use of insurance proceeds as they are property of the estate and should be used to repair or replace the insured property, which is the First Southern's security.  See In re Coker, 216 B.R. 843, 856 (Bankr. N.D. Ala. 1997).  There was no error as to the insurance proceeds.

As for the excess rents, this issue was raised below but not

---

[92]Appellant's (Second) Appendix of Record at 119, Docket No. 75-4.

developed.  Because this case must be remanded to the bankruptcy court to reconsider the value of First Southern's collateral, the bankruptcy court can also consider, in the first instance, whether the value of First Southern's secured claim should include any excess rents collected post-petition and pre-confirmation.

Finally, First Southern argues that the bankruptcy court erred in denying its second stay relief motion.  Section 362(d)(2) of the Bankruptcy Code provides that a court may grant relief from the automatic stay "if ... the debtor does not have an equity in [the] property; and ... such property is not necessary to an effective reorganization[.]"  11 U.S.C. § 362(d)(2).  There is no dispute that debtor does not have any equity in the property.  As to whether the property is necessary for an effective reorganization, "[w]hat this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect.  This means ... that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'"  United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 375-76 (1988) (quoting In re Timbers of Inwood Forest Assocs., 808 F.2d 363, 370-71 and nn. 12-13 (5th Cir. 1987)).  First Southern argues that the plan is not feasible even with the $2.6 million value, much less if the proper $7 to $7.7 million value were used.  Thus, First Southern argues that the plan

-36-

should not have been confirmed, which necessarily means that it was err for the bankruptcy court to not grant its second stay relief motion.

The apartment complex is essential for an effective reorganization. The bankruptcy court did not err in denying First Southern's second stay relief motion.

<u>Conclusion</u>

The bankruptcy court's order denying appellant's second stay relief motion is affirmed. The bankruptcy court's valuation and confirmation orders are affirmed in part and denied in part. This matter is remanded to the bankruptcy court for further proceedings consistent with this opinion.

DATED at Anchorage, Alaska, this <u>18th</u> day of September, 2012.

<u>/s/ H. Russel Holland</u>
United States District Judge

-37-